IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

**FELIX GILLISON, JR.,** *et al.,*

     **Plaintiffs,**

**v.**                                                     **Civil Action No. 3:16cv41**

**LEAD EXPRESS, INC.,** *et al.,*

     **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on two motions: (1) Defendants Lead Express, Inc. and Takehisa Naito's (the "Defendants") Motion to Dismiss Second Amended Complaint for Lack of Subject-Matter Jurisdiction, Personal Jurisdiction and Improper Venue, or, Alternatively, to Transfer Venue (the "Motion to Dismiss"), (ECF No. 26); and, (2) Plaintiffs Felix Gillison, Jr. and Dawn Mays-Johnson's (the "Plaintiffs") Motion for Permission to Take Jurisdiction-Related Discovery, (ECF No. 31). As the basis for the Motion to Dismiss, the Defendants invoke Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(3).[1] The Plaintiffs bring the Motion for Permission to Take Jurisdiction-Related Discovery pursuant to case law that permits limited discovery in response to Rule 12(b)(2) motions. The Plaintiffs have responded to the Motion to Dismiss, (ECF No. 30), and the Defendants have replied, (ECF No. 35). The Defendants have responded to the Motion for Permission to Take Jurisdiction-Related Discovery, (ECF No. 36), and the Plaintiffs have replied, (ECF No. 39).

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.

---

[1] "[A] party may assert the following defenses by motion: (1) lack of subject-matter jurisdiction; (2) lack of personal jurisdiction; [and,] (3) improper venue . . . ." Fed. R. Civ. P. 12(b)(1)–(3).

Accordingly, the matters are ripe for disposition.  The Court exercises jurisdiction pursuant to

28 U.S.C. § 1331.[2]  For the reasons that follow, the Court will:  (1) grant the Motion to Dismiss;

and, (2) deny the Motion for Permission to Take Jurisdiction-Related Discovery without

prejudice.[3]

## I. Procedural and Factual Background

### A.    Procedural Background

The Plaintiffs assert two related class claims against the Defendants:  (1) a violation of

15 U.S.C. § 1681b(f) ("Count One");[4] and, (2) a violation of 15 U.S.C. § 1681q ("Count Two").[5]

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Second Amended Class Action Complaint (the "Second Amended Complaint") alleges violations of 15 U.S.C. §§ 1681b(f) and 1681q of the Fair Credit Reporting Act (the "FCRA").

[3] The Plaintiffs have also filed a motion seeking leave to file supplemental authority. (ECF No. 37.)  The Defendants did not oppose that motion.  In the interest of justice, and for good cause shown, the Court will grant the Plaintiffs' request.  The Court will give the supplemental authorities due weight in light of the parties' arguments.

[4] Section 1681b(f) provides:

**(f) Certain use or obtaining of information prohibited**

A person shall not use or obtain a consumer report for any purpose unless--

(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

(2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

[5] The Plaintiffs mistakenly allege that they assert Count Two under "15 U.S.C. § 1681q(a)."  Section 1681q, however, does not contain a subsection (a), and the Court presumes the Plaintiffs' error to be typographical in nature.  Section 1681q provides:  "Any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined under Title 18, imprisoned for not more than 2 years, or both."  15 U.S.C. § 1681q.

The Plaintiffs allege that the Defendants' violations entitle each consumer to statutory damages under § 1681n(a) between $100 and $1,000.[6]

After the Plaintiffs filed their Second Amended Complaint, the Defendants moved to dismiss it under three separate theories: (1) lack of subject-matter jurisdiction because the Plaintiffs do not have standing to bring this lawsuit; (2) lack of personal jurisdiction; and, (3) improper venue. Alternatively, the Defendants request that the Court transfer venue to the United States District Court for the Central District of California.

Before briefing on the Motion to Dismiss concluded, the Plaintiffs filed the Motion for Permission to Take Jurisdiction-Related Discovery. The Plaintiffs request that, in the event the Court finds that the Plaintiffs have not established personal jurisdiction, the Court permit the parties to conduct discovery for 90 days. The Plaintiffs have responded to the Motion to Dismiss, and the Defendants have responded to the Motion for Permission to Take Jurisdiction-Related Discovery. Both parties have filed their respective reply briefs.

---

[6] Section 1681n(a) provides that "[a]ny person who willfully fails to comply with" the FCRA "is liable to that consumer" for "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000" and "such amount of punitive damages as the court may allow." 15 U.S.C. § 1681n(a).

### B.    Factual Background[7]

This case arises out of a purported "sham business operation" orchestrated by Lead

Express and its principal and alter ego, Takehisa Naito.[8]  (Second Am. Compl. ¶¶ 2, 40.)  Lead

Express obtains millions of consumer reports on consumers with whom it has no relationship.

According to the Plaintiffs, because Lead Express has no relationship with these consumers, it

obtains reports without a permissible purpose, in violation of 15 U.S.C. § 1681b(f).[9]  The

Plaintiffs also assert that Lead Express obtained the consumer reports under false pretenses, by

alleging that it was the "end user" of the reports.  (*Id.* ¶ 16.)

The Plaintiffs represent some of the thousands of consumers whose consumer reports

Lead Express obtained from Clarity Service, Inc. ("Clarity"), "a nontraditional consumer-

reporting agency that specializes in assembling subprime consumer data."  (*Id.* ¶ 12.)  "Unlike

---

[7] The Court construes facts differently when assessing the two grounds for dismissal before it.  When considering the Defendants' Motion to Dismiss for lack of subject-matter jurisdiction, the Court remains mindful that the Plaintiffs bear the burden of establishing jurisdiction, including Article III standing to sue.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing, the Plaintiffs "must 'clearly . . . allege facts demonstrating' each element" of standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)), *as revised* (May 24, 2016).

The Plaintiffs bear the burden of proving grounds for personal jurisdiction, too.  *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  But the Court views the Motion to Dismiss for lack of personal jurisdiction through a different lens.  Where, as here, neither party has sought an evidentiary hearing (which requires a showing of personal jurisdiction by a preponderance of the evidence), the Court determines only whether the Plaintiffs have made a prima facie showing of personal jurisdiction.  *Id.*  In evaluating whether a plaintiff has made a prima facie demonstration of personal jurisdiction, the Court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  *Brooks v. Motsenbocker Advanced Devs., Inc.*, 242 F. App'x 889, 890 (4th Cir. 2007).

[8] The Plaintiffs contend that Lead Express merely constitutes the alter ego of Naito, "who used the information obtained from Clarity to find leads for his internet payday lending companies."  (Second Am. Compl. ¶ 40.)

[9] Section 1681(b)(a) enumerates an exhaustive list of six specific circumstances under which a consumer reporting agency may provide a consumer report.

traditional consumer-reporting agencies, most of Clarity's major customers did not buy its data to determine if a loan applicant would pay his or her bills." (*Id.* ¶ 13.) Rather, companies like Lead Express secretly purchase Clarity's consumer reports for the purpose of targeting vulnerable customers who may have interest in high-interest loans. By using Clarity, the Defendants could bypass Experian's more stringent credentialing and conceal the role of La Posta Tribal Lending Enterprise ("La Posta Lending")[10] in offering these loans. Such practices also make it more difficult for consumers to know who obtained their report.

The Plaintiffs allege that Clarity obtained their consumer reports from Experian and sold them to Lead Express, who would "*purportedly*" utilize the information to evaluate consumers for loans. (*Id.* ¶ 15.) In accordance with this practice, Lead Express executed an "end user" agreement with Clarity, in which Lead Express represented that it constituted the "end user" of the consumer reports.[11] (*Id.* ¶ 16.) Lead Express then obtained consumer reports from Clarity, including more than 30,000 consumer reports on Virginia consumers during a five-year period. The purpose of obtaining these reports was to target Virginia consumers for high-interest loans. Lead Express obtained Gillison's consumer report on January 17, 2014, and Mays-Johnson's report on May 8, 2015, in order to market high-interest loans to them.

In spite of Lead Express's certification that it was the "end user" of the consumer reports, Lead Express never provided a "firm offer of credit" to the Plaintiffs, and the Plaintiffs never

---

[10] The Plaintiffs do not explicitly allege La Posta Lending's role in the scheme. A declaration submitted by the Defendants indicates that La Posta Lending acts as an originator of loans. (*See, e.g.*, Chung Decl. ¶ 16, ECF No. 27-1 (stating in a sworn affidavit that Lead Express obtains consumer reports to assist La Posta Lending with the origination of loans).) The Plaintiffs' briefing suggests that the Plaintiffs concur in this characterization.

[11] An "end user" is "the actual creditor who would ultimately use the report to evaluate the consumer for credit." (Second Am. Compl. ¶ 16.)

applied for credit with Lead Express or authorized Lead Express to pull their reports.[12]  (*Id.*

¶ 23.)  Rather, Lead Express purchased the consumer data "in order to obtain leads on potential

consumers who may be interested in high-interest loans"—data an affiliate company would use

to offer loans to consumers.  (*Id.* ¶¶ 25–26.)  Accordingly, the Plaintiffs contend, Lead Express

"lacked a permissible purpose to obtain [the] Plaintiffs' consumer reports."  (*Id.* ¶¶ 23, 27.)

## II.  Analysis:  Motion to Dismiss

The Defendants bring the Motion to Dismiss under three theories:  (1) the Plaintiffs lack

standing to bring this lawsuit following the Supreme Court of the United States' decision in

*Spokeo*; (2) the Court lacks personal jurisdiction over the Defendants; and, (3) venue in this

Court is improper.  Alternatively, the Defendants request that the Court transfer venue to the

United States District Court for the Central District of California.  In the event the Court finds

dismissal appropriate for lack of personal jurisdiction, the Plaintiffs have asked that the Court

permit the parties to conduct discovery for 90 days.  For the reasons that follow, the Court will

grant the Motion to Dismiss for lack of personal jurisdiction.  The Court will deny the Motion for

Permission to Take Jurisdiction-Related Discovery without prejudice, and order the parties to

submit supplemental briefing regarding the jurisdictional discovery request.

### A.    The Court Will Deny the Motion to Dismiss for Lack of Standing

The Defendants anchor their subject-matter jurisdiction argument in the contention that

the Plaintiffs lack standing under Article III of the Constitution of the United States.[13]  In

---

[12] The Plaintiffs allege that "upon information and belief, *not a single consumer ever*
applied for credit with Lead Express and Lead Express never loaned any consumer any amount
of money."  (Second Am. Compl. ¶ 24 (emphasis added).)

[13] Article III provides, in relevant part:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this
Constitution, the Laws of the United States, and Treaties made, or which shall be

*Spokeo,* the Supreme Court discussed the manner in which a plaintiff must allege "injury in fact" in order to establish standing for what courts call a "statutory violation" resulting in an "informational injury." Relying on *Spokeo,* the Defendants contend that the Plaintiffs' allegations in the Second Amended Complaint fail to set forth any "concrete" injury in fact caused by the alleged statutory violation. The Plaintiffs dispute that assertion, arguing that, even after *Spokeo,* an "informational injury" may be both particularized and concrete.

The Court offers background regarding Article III standing, and what could constitute an injury in fact under *Spokeo,* to explain why it finds that the Plaintiffs have standing to bring this suit.

### 1.    The Three-Part Test Used to Evaluate Article III Standing

Federal district courts are courts of limited subject-matter jurisdiction. *United States ex rel. Vuyyuru v. Jadhav,* 555 F.3d 337, 347 (4th Cir. 2009) (citing *Exxon Mobile Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 552 (2005)). This Court must, as a result, determine whether it has jurisdiction over the claims at issue. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan,* 111 U.S. 379, 382 (1884)). "The objection that a federal court lacks subject-matter jurisdiction . . . may be

---

made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2, cl. 1.

raised by a party, or by a court on its own initiative, at any stage in the litigation . . . ." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

The United States Constitution limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. As the Supreme Court has explained, an "essential and unchanging part of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue. *Lujan*, 504 U.S. at 560. In *Spokeo*, the Supreme Court reiterated that, in order to establish standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant;[14] and[,] (3) that is likely to be redressed by a favorable judicial decision.[15]" 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61).

As the party invoking federal jurisdiction, the Plaintiffs bear the burden of properly alleging standing. *Lujan*, 504 U.S. at 560; *see also Balzer & Assoc., Inc. v. Union Bank & Trust*, 3:09cv273, 2009 WL 1675707, at *2 (E.D. Va. June 15, 2009) ("On a motion to dismiss pursuant to Rule 12(b)(1), the party asserting jurisdiction has the burden of proving subject matter jurisdiction." (citing *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 764, 768 (4th Cir. 1991)). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

---

[14] To show a causal connection, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).

[15] A party may establish the third element of standing by showing "that the injury will be [likely] 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43). A plaintiff cannot have standing where redressability of an injury is merely "speculative." *Id.*

On the issue of subject-matter jurisdiction, the parties here dispute only whether, post-*Spokeo*, the Plaintiffs allege an injury in fact. In a different context, this Court already has found that *Spokeo* refined, but did not redefine, the injury-in-fact analysis. *See, e.g.*, *Clark v. Trans Union, LLC*, No. 3:15cv391, 2016 WL 7197391 (E.D. Va. Dec. 9, 2016) (finding that plaintiff alleged standing on 15 U.S.C. § 1681g(a)(2) claim).[16] The Plaintiffs present an even stronger argument for establishing standing on their §§ 1681b(f) and 1681q claims. As other courts in the Eastern District of Virginia have explained, not only has Congress defined the invasion of one's privacy as an injury in fact, but courts traditionally have recognized statutory violations rooted in privacy invasions as a basis for suit. *See, e.g.*, *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d. 623, 637 (E.D. Va. 2016) (finding that plaintiff asserted standing under §§ 1681b(b)(2) and 1681b(b)(3));[17] *see also Gambles v. Sterling Infosystems, Inc.*, No. 15 CIV. 9746, 2017 WL

---

[16] Section 1681g(a)(2) requires that consumer reporting agencies "clearly and accurately" disclose to consumers "[t]he sources of information" in their credit files. 15 U.S.C. § 1681g(a)(2). In *Clark*, this Court found that an alleged violation of § 1681g(a)(2) sufficed to establish injury in fact because the purpose of the FCRA reveals that Congress intended consumers to have the ability to correct information in their consumer reports. Thus, the *Clark* defendant's purported failure to disclose source information established the "'invasion of a legally and protected interest' that is 'concrete and particularized.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).

[17] In *Thomas*, the court determined that § 1681b(b)(2), which prohibits the impermissible procurement of a prospective employee's consumer report, creates two statutory rights that confer standing: "first, a legally cognizable right to receive a disclosure that is clear, conspicuous, and unencumbered by extraneous information; and second, a right to the privacy of one's personal information, which an employer may not invade without first providing the above information and obtaining the consumer's express written consent." 193 F. Supp. 3d at 634. Regarding the plaintiff's § 1681b(b)(3) claim, which requires that a prospective employee be given his or her consumer report before adverse action is taken, the court found standing in "a legally cognizable right to specific information." *Id.* at 637.

589130, at *10 (S.D.N.Y. Feb. 13, 2017) (finding that plaintiff asserted standing under 15 U.S.C. §§ 1681c(a) & 1681e(b)).[18] Thus, the Plaintiffs' claims survive *Spokeo*.

### 2.   Standard to Demonstrate an Injury in Fact Post-*Spokeo*

In *Spokeo*, the plaintiff, Thomas Robins, brought suit under the FCRA against Spokeo, a company that operates a people search engine. 136 S. Ct. at 1544, 1554. Robins invoked 15 U.S.C. § 1681(e), alleging that Spokeo failed to "follow reasonable procedures to assure maximum accuracy of consumer reports" when, while he was out of work, it incorrectly profiled his age, marital status, education degree, and employment status. *Id.* While ruling, the Supreme Court confirmed that, in order to establish an injury in fact, a plaintiff must demonstrate that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The Supreme Court found that the United States Court of Appeals for the Ninth Circuit improperly "elided" the concreteness requirement. *Id.* Because the Ninth Circuit addressed only the "particularization" aspect of the test, the Supreme Court remanded the case for further proceedings. *Id.* at 1550. In so finding, the *Spokeo* court defined both terms with specificity.

First, for an injury to be "particularized," the Court found that it "'must affect the plaintiff in a personal and individual way.'" *Id.* at 1548 (citing *Lujan*, 504 U.S. at 560 n.1). Thus, an "undifferentiated, generalized grievance" that all citizens share would not qualify as particularized. *Lance v. Coffman*, 549 U.S. 437, 442 (2007). "[T]he fact that an injury may be suffered by a large number of people," however, "does not of itself make that injury a

---

[18] *Gambles*, relying on *Thomas*, recognized standing on the plaintiff's §§ 1681c(a) and 1681e(b) claims because both claims concern invasions of privacy. *See* 15 U.S.C. § 1681c(a) (listing particular items of information that consumer reports cannot contain); 15 U.S.C. § 1681e(b) (prohibiting the procurement of consumer reports for resale purposes). The *Gambles* court explained that both the common law and the judgment of Congress recognize an invasion of privacy as a basis for suit.

nonjusticiable generalized grievance." *Spokeo*, 136 S. Ct. at 1548 n.7. The proper inquiry is whether "each individual suffers a particularized harm." *Id.*

Second, the *Spokeo* Court stated that for an injury to be "concrete," it must be "de facto," meaning that it must be "real," and not "abstract." *Spokeo*, 136 S. Ct. at 1548. That said, an injury need not be "tangible" in order to be "concrete." *Id.* at 1549. An intangible injury may qualify as an injury in fact. *Id.* In evaluating whether an intangible injury satisfies the "concreteness" requirement, the Supreme Court reiterated two important considerations: (1) history, which may reveal "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts"; and, (2) the judgment of Congress, which "'has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'"[19] *Id.* (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in judgment)).

---

[19] With respect to this congressionally-defined, or statutory, standing, the *Spokeo* Court explained: "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct. at 1549. Thus, a plaintiff "could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.")). Regarding the FCRA, the Supreme Court noted that "not all inaccuracies cause harm or present any risk of harm." *Id.* at 1550. By way of example, the Supreme Court suggested that it would be "difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id.* at 1550.
　　The Court also observed, however, that in cases where "harms may be difficult to prove or measure[,]" "the violation of a procedural right granted by statute can be sufficient . . . [and] a plaintiff in such a case need not allege any *additional harm* beyond the one Congress has identified." *Id.* at 1549 (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989)).

### 3. Post-*Spokeo*, the Plaintiffs Retain Standing to Pursue Their Claims Under 15 U.S.C. §§ 1681b(f) and 1681q

Here, the Court must determine whether, by alleging violations of 15 U.S.C. §§ 1681b(f) and 1681q, the Plaintiffs demonstrate an "invasion of a legally and protected interest' that is 'concrete and particularized.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). At the core of the Plaintiffs' claims lies an invasion of privacy caused by an impermissible procurement of their consumer reports. Guided by *Spokeo*'s refined injury-in-fact requirement, the Court must consider: (1) the history of this alleged harm to determine if it has a close relationship to a harm that has traditionally provided a basis for suit; and, (2) the judgment of Congress. Applying either of the two considerations set forth in *Spokeo*, this Court concludes that the Plaintiffs have standing.

The Plaintiffs can establish standing on *Spokeo*'s first inquiry, which asks whether they allege a harm closely related to a harm that has traditionally provided a basis for suit. A significant history exists, including at common law, of lawsuits based on the unauthorized disclosure of a person's private information. The Supreme Court has described private information as information not freely available to the public or information that is intended for or restricted to particular people. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989). The Supreme Court has noted that the "common law and literal understandings of privacy encompass" protection of a person's private information. *Id.*

As explained in this District, "it has long been the case that an unauthorized dissemination of one's personal information, even without a showing of actual damages, is an invasion of one's privacy that constitutes a concrete injury sufficient to confer standing to sue." *Thomas*, 193 F. Supp. 3d at 636 (citing Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890)). As a result, "it is well-settled that Congress may create a

statutory right to privacy in certain information that strengthens or replaces the common law, and citizens whose statutory right to informational privacy has been invaded may bring suit under the statute to vindicate that right." *Id.* (citing 18 U.S.C. § 2707(c) (authorizing statutory damages for violations of the Electronic Communications Privacy Act of 1986)); 12 U.S.C. § 3417 (statutory damages available under the Right to Financial Privacy Act); 18 U.S.C. § 2710(c)(1) (establishing a private right of action under the Video Privacy Protection Act)); *see also* *Gambles*, 2017 WL 589130, at *9 (same).

Here, the Plaintiffs allege that the Defendants invaded their statutory right to the confidentiality of their personal information by obtaining their consumer reports without authorization, *see* 15 U.S.C. § 1681b(f), and under false pretenses, *see id.* § 1681q. Such unauthorized acquisitions of personal information would constitute invasions of privacy that qualify as concrete injuries sufficient to confer Article III standing. *See Thomas*, 193 F. Supp. 3d. at 637; *Gambles*, 2017 WL 589130, at *10.

In addition to the history of claims rooted in the invasion of privacy, the Plaintiffs can establish standing on *Spokeo*'s second consideration, which requires courts to turn to the judgment of Congress. The purpose of the FCRA indicates that Congress intended to identify and permit relief at law for the harms that the Plaintiffs allege. This Court looked to the underlying purpose of the FCRA when finding standing in *Clark*, as did the Honorable Robert E. Payne, United States District Judge, in *Thomas*. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001). Specifically, Congress intended to address developments in "computer technology [that] facilitated the storage and interchange of information" and "open[ed] the possibility of a nationwide data bank covering every citizen."

13

S. Rep. No. 517, 91st Cong., 1st Sess. 2 (1969) ("Senate Report"). As remarked by one member of Congress, "with the trend toward . . . the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his [or her] reputation without cause, and make him [or her] unemployable." 116 Cong. Rec. 36570 (1970).

Because of these "computerized data banks," Congress "found that in too many instances agencies were reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment." *Dalton*, 257 F.3d at 414. Congress, in turn, sought "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information," and "to *prevent an undue invasion of the individual's right of privacy in the collection and dissemination of credit information*." Senate Report at 1 (emphasis added). Ultimately, the FCRA reflects congressional recognition of the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, *and a respect for the consumer's right to privacy*." 15 U.S.C. § 1681(a)(4) (emphasis added); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) ("Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting . . . and *protect consumer privacy*." (emphasis added)).

In the FCRA, Congress has specifically provided that a consumer has protection from the unauthorized acquisition of his or her consumer report by another. 15 U.S.C. § 1681b(f). Congress has also prohibited the gathering of information about a consumer under false pretenses. *Id.* § 1681q. As such, in Congress's legislative judgment, where consumer information is obtained in an unauthorized manner, especially under false pretenses, the consumer suffers the violation of his or her right to privacy. *See Spokeo*, 136 S. Ct. at 1549

(noting the importance of legislative judgment to the standing analysis); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (same).[20] Accordingly, a consumer who alleges that a defendant has obtained his or her personal information without authorization, like the Plaintiffs here, has alleged a concrete informational injury.[21] Having found that the Plaintiffs have standing, the Court turns to the Defendants' personal-jurisdiction challenge.

---

[20] The Honorable Henry E. Hudson, United States District Judge, reached the same conclusion when evaluating a plaintiff's standing to bring a claim under 15 U.S.C. § 1681b(f), one of the statutes at bar:

> The FCRA was meant to protect the interest of privacy. The portion of the FCRA at issue here is clear that one's consumer report is not to be obtained except for the limited purposes specifically provided by the statute. The language and context of this provision seem to establish a statutory right to privacy based in one's consumer report. As *Spokeo* counsels, this Court must defer to history and the judgment of Congress in deciding whether the alleged harm constitutes an injury-in-fact. In some sense, the right at issue can appear procedural, as it is a mechanism intended to prevent further harms. Yet, given the purposes, framework, and structure of the FCRA, the right to privacy established by the statute appears to be more substantive than procedural.

*Burke v. Fed. Nat'l Mortg. Ass'n*, No. 3:16cv153, 2016 WL 4249496, at *4 (E.D. Va. Aug. 9, 2016), *vacated*, No. 3:16cv153, 2016 WL 7451624 (E.D. Va. Dec. 6, 2016) (vacating case on agreement by the parties). Other courts have followed *Burke*'s reasoning in finding standing on § 1681b(f) claims. *See, e.g., Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 WL 7018564, at *4 (E.D. Va. Nov. 10, 2016), *report and recommendation adopted*, No. 2:16cv421, 2016 WL 7031287 (E.D. Va. Nov. 30, 2016); *Firneno v. Nationwide Mktg. Servs., Inc.*, No. 2:14cv10104, 2017 WL 85831, at *3 (E.D. Mich. Jan. 10, 2017). *But see Bultemeyer v. CenturyLink, Inc.*, No. CV-14-02530-PHX-SPL, 2017 WL 634516, at *4 (D. Ariz. Feb. 15, 2017) ("[A]bsent disclosure to a third party or an identifiable harm from the statutory violation, there is no privacy violation.").

[21] The Defendants rely on *Smith v. Ohio State Univ.*, No. 2:15cv3030, 2016 WL 3182675 (S.D. Ohio June 8, 2016), to support their sweeping assertion that "the harm of invasion of privacy and statutory damages for pulling a credit report, without any allegation of concrete consequential damage, is insufficient to establish an injury-in-fact for violation of the FCRA," (Mem. Supp. Mot. Dismiss 10, ECF No. 27). As this Court explained in *Clark, Smith* is readily distinguishable. *Clark*, 2016 WL 7197391, at *10 n.21.

In *Smith*, the Court remanded the case to the Ohio Court of Claims without applying guidance from *Spokeo* or addressing congressional power to create an informational injury. Rather, as even the Defendants here acknowledge, the court's decision stemmed from the

**B.    The Court Will Grant the Motion to Dismiss for Lack of Personal Jurisdiction**

The Court will grant the Motion to Dismiss because the Plaintiffs cannot make a prima facie showing of personal jurisdiction. The Plaintiffs allege that this Court has personal jurisdiction over the Defendants because, by obtaining more than 30,000 consumer reports of Virginia residents without authorization, the Defendants purposefully availed themselves of the privilege of conducting activities in Virginia. The Court cannot find that such contacts, even construed in the light most favorable to the Plaintiffs, suffice to establish specific personal jurisdiction.[22]

### 1.    The Plaintiffs Bear the Burden of Proving Personal Jurisdiction

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc.*, 334 F.3d at 396. When a district court considers a challenge to personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction, rather than show jurisdiction by a preponderance of the evidence. *Id.*; *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). "The [C]ourt, in deciding whether a plaintiff has met this burden, must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Brooks*, 242 F. App'x at 890. "If a plaintiff makes the requisite showing, the

---

plaintiffs' admission "that they did not suffer a concrete consequential damage as a result of [the defendant's] alleged breach of the FCRA." 2016 WL 3182675, at *4. The Plaintiffs here, of course, have not made such a concession. Insofar as *Smith* presumes that monetary damages must be alleged in order for a plaintiff to establish Article III standing, *Spokeo* teaches otherwise. *Spokeo*, 136 S. Ct. at 1549.

[22] As the Court will explain, the Plaintiffs concede that the Defendants are not susceptible to general jurisdiction in Virginia.

defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to violate due process." *Reynolds Foil, Inc. v. Pai*, No. 3:09cv657, 2010 WL 1225620, at *1 (E.D. Va. Mar. 25, 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477–78 (1985)). "For purposes of the motion to dismiss, the reviewing court may presume that any uncontradicted evidence submitted by either party is true." *Id.*

## 2. Personal Jurisdiction Standard

Federal courts exercise personal jurisdiction in the manner provided by state law. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). Therefore, a district court must first decide whether Virginia state law permits the court to exercise personal jurisdiction over the defendant, and second, whether the exercise of such jurisdiction comports with the due process requirements of the Fourteenth Amendment. *Id.*; *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997). "Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) (quoting *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135–36 (4th Cir. 1996)) (internal citation omitted). Accordingly, the inquiry becomes whether the defendant maintains sufficient minimum contacts with the forum state so as not to offend "'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also

provide the basis for the suit." *Carefirst of Md., Inc.*, 334 F.3d at 397. "If the defendant's

contacts with the State are also the basis for the suit, those contacts may establish specific

jurisdiction. . . . [I]f the defendant's contacts with the State are not also the basis for suit, then

jurisdiction over the defendant must arise from the defendant's general, more persistent, but

unrelated contacts with the State." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d

707, 712 (4th Cir. 2002) (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U .S.

408, 414 & nn.8–9 (1984)). The Plaintiffs here assert only specific personal jurisdiction.[23]

The United States Court of Appeals for the Fourth Circuit has adopted a three-part test to

determine whether specific jurisdiction exists. *Reynolds Foil, Inc.*, 2010 WL 1225620, at *2.

The Court must consider: "(1) the extent to which the defendant purposefully avail[ed] itself of

the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of

those activities directed at the State; and[,] (3) whether the exercise of personal jurisdiction

would be constitutionally reasonable." *ALS Scan, Inc.*, 293 F.3d at 712 (alteration in original)

(internal citations omitted).

With respect to the first factor, "no clear formula [exists] for determining what constitutes

'purposeful availment.'" *Reynolds Foil, Inc.*, 2010 WL 1225620, at *2. The Court, however,

may consider whether the defendant maintains offices or agents in the forum state; whether the

defendant owns property in the forum state; whether the defendant reached into the forum state

to solicit or initiate business; whether the defendant deliberately engaged in significant or long-

---

[23] Appropriately, the Plaintiffs do not seek to establish general personal jurisdiction.
General jurisdiction exists only when a defendant's "affiliations with the State are so 'continuous
and systematic' as to render [it] *essentially at home* in the forum State.'" *Daimler AG v. Bauman*,
134 S. Ct. 746, 760 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S.
915, 919 (2011)) (emphasis added). For company-defendants, "only a limited set of affiliations
with a forum" will typically satisfy this standard, such as the defendant's place of incorporation
or principal place of business. *Id.*

term business activities in the forum state; whether the parties contractually agreed that the law of the forum state would govern disputes; whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; the nature, quality, and extent of the parties' communications about the business transactions; and, whether the performance of contractual duties was to occur within the forum. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (internal citations omitted). "If, and only if . . . the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the Court] move on to a consideration of prongs two and three." *Id.*

"The second prong of the test for specific jurisdiction . . . requires that the defendant's contacts with the forum state form the basis of the suit." *Id.* at 278–79 (citing *Burger King*, 471 U.S. at 472; *Helicopteros Nacionales de Columbia, S.A.*, 466 U.S. at 414). The third prong of the specific jurisdiction test "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." *Id.* at 279. Specifically, the court may consider: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and, (5) the interests of the states in furthering substantive social policies. *Id.* (citing *Burger King*, 471 U.S. at 477).

### 3.   The Plaintiffs Cannot Establish Specific Jurisdiction

The Plaintiffs fail to make a prima facie showing of specific personal jurisdiction. The Plaintiffs appear to assert specific jurisdiction under two theories of purposeful availment.[24]

---

[24] The Plaintiffs do not brief these assertions separately. The Court addresses them independently to assure that an appropriate analysis of the law and facts commences.

First, the Plaintiffs allege that the Defendants' business contacts with Virginia rise to the level of purposeful availment.[25] In support of this theory and in spite of their own allegations to the contrary, the Plaintiffs contend that Lead Express acquired the Plaintiffs' consumer reports in order to "obtain their financial information for the purpose of soliciting them for a loan." (Opp'n Mot. Dismiss 16, ECF No. 30.) Second, the Plaintiffs allege that the Defendants have purposefully availed themselves of the privilege of conducting business in Virginia because they caused harm there. In response, the Defendants make a fruitless attempt to deny any business relationships in Virginia or with Virginia consumers.[26] (*See* Chung Decl., ECF No. 27-1; Naito

---

[25] The Plaintiffs allege that Naito constitutes the alter ego of Lead Express. As a result, the Court may impute Lead Express's contacts with Virginia to Naito when determining whether it has jurisdiction over him. *See Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 434 (4th Cir. 2011) (explaining that courts can pierce the corporate veil to establish jurisdiction over an alter ego). To the extent the Plaintiffs allege that Naito acts as an alter ego for, or in concert with, companies other than Lead Express, such as La Posta Lending, the Court sees no basis for imputing those contacts to Naito. The Plaintiffs do not brief such a theory, and even viewing the Second Amended Complaint in the Plaintiffs' favor, the Plaintiffs do not assert specific contacts that any affiliate corporations have with Virginia that the Court could impute to establish jurisdiction over Naito.

[26] In support of their motion to dismiss, the Defendants offer sworn disavowals of any business relationships in Virginia or with Virginia consumers. (*See* Chung Decl., ECF No. 27-1; Naito Decl., ECF No. 27-2.) Normally, at this procedural posture, the Court could "presume that any uncontradicted evidence submitted by either party is true." *Reynolds Foil, Inc.*, 2010 WL 1225620, at *1. The Plaintiffs, however, challenge Defendants' declarations as unreliable because some statements contradict earlier testimony from the same declarants. (*See* Decl. of Naito for Lead Express, Inc., *Turnage v. Clarity Services, Inc.*, 3:14cv760, ECF No. 30-1; *see also* Second Am. Compl. ¶ 19.) The Plaintiffs also highlight declarations filed in this case in which the declarant, under oath, contradicts himself. (*Compare* Chung Decl., ECF. No. 12-1, *with* Chung Decl. ¶¶ 18–19, ECF No. 27- 1; *see also* Second Am. Compl. ¶¶ 29–30.)

The Plaintiffs argue that the contradictory information declared on behalf of Lead Express means that "the Court should not accept any of the representations in Chung's declaration as it relates to Lead Express's business practices" because the contradictions demonstrate unreliability and, by implication, a concerted attempt to evade this Court's jurisdiction. (Opp'n Mot. Dismiss 4.) In the end, however, these arguments are of no moment to deciding jurisdiction because the Court need not rely on these declarations to evaluate whether the Plaintiffs make a prima facie showing of personal jurisdiction.

Decl., ECF No. 27-2.)  Even excluding the Defendants' evidence, for the reasons articulated

below, both of the Plaintiffs' jurisdictional theories fail.

> **a.     The Plaintiffs' Allegations Fail to Establish Purposeful
>          Availment Based on the Defendants' Business Contacts in
>          Virginia**

The Plaintiffs flatly contend that specific jurisdiction exists because the Defendants

"purposefully availed themselves of the benefits of operating in Virginia by reaching 'into the

forum state to solicit or initiate business' and by engaging 'in significant [and] long-term

business activities' in Virginia." (Opp'n Mot. Dismiss 16 (citing *Liberty Mut. Fire Ins. Co. v.*

*Menozzi Luigi & C. S.p.A.*, 92 F. Supp. 3d 435, 440 (E.D. Va. 2015)).  The Plaintiffs'

jurisdictional allegations do not persuade.

The overarching jurisdictional allegation in the Second Amended Complaint states:

"Lead Express obtained more than 30,000 consumer reports *from Clarity on Virginia consumers*

*alone* during a five-year period." (Second Am. Compl. ¶ 19 (emphasis added).)  The Plaintiffs

specifically contend that Lead Express obtained consumer reports, including those of Gillison

and Mays-Johnson, with the *intention* of marketing high-interest loans to them. (*Id.* ¶¶ 20–21.)

At face value, these allegations cannot rise to the level of purposeful availment necessary to

establish specific personal jurisdiction.  Indeed, the Plaintiffs allege only that the Defendants

obtained consumer reports "*on* Virginia consumers," not *from* Virginia consumers.  This

distinction is critical.

The Second Amended Complaint clearly asserts that Lead Express obtained the consumer

reports from Clarity, a Nevada corporation.  Obtaining information on Virginia consumers from

a third-party without any direct interaction with those Virginia consumers does not establish

purposeful availment. *See Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 417 ("[The]

unilateral activity of another party or a third person is not an appropriate consideration when

determining whether a defendant has sufficient contacts with a forum State to justify an assertion

of jurisdiction"); *see also Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014) ("Due process requires

that a defendant be haled into court in a forum State based on his [or her] own affiliation with the

State, not based on the 'random, fortuitous, or attenuated' contacts he [or she] makes by

interacting with other persons affiliated with the State." (quoting *Burger King*, 471 U.S. at 475)).

The Plaintiffs attempt to flesh out their jurisdictional arguments in their response to the

Motion to Dismiss. Without adding facts by way of amending the Second Amended Complaint,

the Plaintiffs argue that "deliberately obtaining . . . consumer reports on Virginia residents for the

purpose of reaching into Virginia to offer illegal loans to eligible customers" establishes

purposeful availment. (Opp'n Mot. Dismiss 3.) They describe an "internet payday lending

industry [that] is littered with shell entities and fly-by-night companies who blatantly violate

federal and state laws." (*Id.* at 1.) The Plaintiffs argue that Lead Express, a company whose

"Google search . . . would reveal nothing," "purchased consumer reports in batches in order to

resell them as 'leads,' *i.e.*, marketing targets for high-interest Internet and 'Tribal' payday loans."

(*Id.* at 2.) To support these claims, the Plaintiffs turn to Naito's 2015 declaration in *Turnage*, in

which he declared that Lead Express used the consumer reports "to evaluate credit worthiness."

(Second Am. Compl. ¶ 18.) This fails to establish purposeful availment of Virginia.

First, the Plaintiffs ably have called into question any declarations offered by Naito,

Chung, or Lead Express.[27]  But more pertinently, such an allegation of outside-Virginia activity,

---

[27] The Plaintiffs identify startling inconsistences in these declarations. *See supra* n.26. These inconsistencies give the Court significant pause. Unfortunately for the Plaintiffs, the hesitation includes questioning why the Plaintiffs can, in their attempt to establish personal jurisdiction, and without explanation, rely on a 2015 declaration describing Lead Express's business practices rather than the 2016 declaration filed in *this* case about Lead Express's business practices.

even if true, fails to show how the Defendants purposefully availed themselves of the privilege of conducting activities *in* Virginia. For instance, while the Plaintiffs claim that Lead Express obtained their reports with the purpose of targeting them for loans,[28] the Plaintiffs never allege *any* solicitations, much less any that occurred in Virginia.[29] Instead, the Plaintiffs assert that they never applied for credit with Lead Express and that Lead Express never provided a "firm offer of credit" to them. (Second Am. Compl. ¶ 23.) Such allegations seemingly comport with the Plaintiffs' theory on the merits, that Lead Express "obtains millions of consumer reports on consumers with whom it has *no relationship.*" (*Id.* ¶ 2 (emphasis added).)

---

When arguing that Naito's testimony establishes that Lead Express evaluated credit worthiness by using the credit reports pulled by Clarity, the Plaintiffs rely on the 2015 Naito declaration submitted in a case before Judge Hudson. (Decl. of Naito for Lead Express, Inc., *Turnage v. Clarity Services, Inc.*, 3:14cv760, ECF No. 30-1.) There, Naito stated as CEO of Lead Express that Lead Express was an underwriter, administrator, servicer, and application processor for La Posta Lending, and that Lead Express provided the loan information to Clarity, who in turn gave Lead Express "various credit reports [Lead Express] could use to evaluate credit worthiness" and recommend "qualified borrowers" to La Posta Lending. (*Id.* ¶¶ 6, 8–17.)

However, in direct contrast to Naito's declaration filed in *Turnage* just eight months prior, Chung, as general manager of Naito Corporation, told *this* Court under oath that Lead Express *does not* access consumer data, service any loans, obtain credit reports, or underwrite or evaluate any consumer to determine whether a consumer will be offered a loan. (Chung Decl., ECF. No. 12-1, ¶¶ 7, 10–12.) And in a final contradictory iteration, general manager Chung declares in support of *this* Motion to Dismiss that "all information from Clarity, including the consumer data, is transferred directly from Clarity to La Posta Lending" and that the information is "stored on La Posta Tribal Lending's server." (Chung Decl. ¶¶ 18–19, ECF No. 27-1.) Naito submitted a short declaration disavowing ties to Virginia alongside Chung's two submissions in the case at bar. (Naito Decls., ECF Nos. 12-2, 27-2.)

These inconsistencies are troubling. As explained *infra*, the Court will require briefing from the parties on this and other matters.

[28] The Court will separately address the impact on jurisdiction, if any, of this "targeting" under the Plaintiffs' effects-test theory of personal jurisdiction.

[29] Even if Lead Express did solicit loans in Virginia, the Court would still need to decide whether the statutory violations alleged by the Plaintiffs arose out of those contacts. *See Consulting Eng'rs Corp.*, 561 F.3d at 278–79.

The Second Amended Complaint alleges that, upon obtaining the Plaintiffs' consumer reports from Clarity, Lead Express falsely certified to Clarity that Lead Express was the "end user" of the report. (Second Am. Compl. ¶¶ 22, 23.) The Plaintiffs assert that, in spite of this certification, Lead Express did not obtain the credit reports to conduct business with Virginia consumers, but to obtain leads for affiliate companies, which would then "market high interest payday loans to vulnerable customers." (*Id.* ¶ 38.) In other words, the Plaintiffs' case theorizes that Lead Express obtained the Plaintiffs' financial information without any intention to conduct business in Virginia, presumably because some affiliate company (possibly another company within Naito's sham corporate structure) would conduct the loan marketing and originating business instead.

Now seeking to establish minimum contacts, the Plaintiffs raise speculative contacts (*i.e.*, the possibility that Lead Express solicited Virginia consumers for loans) plainly at odds with the facts alleging that Lead Express was not an "end user." The Plaintiffs cannot assert that Lead Express acquired the consumer reports for a purpose other than conducting business with them, and at the same time—for the limited purpose of establishing personal jurisdiction—proffer that Lead Express "reach[ed] 'into [Virginia] to solicit or initiate business'" or "engag[ed] 'in significant [and] long-term business activities'" there. (Opp'n Mot. Dismiss 16 (citation omitted).) Indeed, the contacts establishing specific personal jurisdiction must "arise out of" the Plaintiffs' causes of action. *See Fireclean LLC v. Tuohy*, No. 1:16cv294, 2016 WL 4414845, at *5 (E.D. Va. June 14, 2016) (explaining that allegations in support of specific personal jurisdiction must be included in the complaint because those contacts must "create[ ], in [the plaintiff], a potential cause of action cognizable in [Virginia's] courts" (quoting *ALS Scan*, 293

F.3d at 714)). Accordingly, the Plaintiffs cannot establish specific personal jurisdiction based on the Defendants' so-called business "contacts" with Virginia.

> **b.   The "Effects" Test Cannot Establish Personal Jurisdiction Over the Defendants**

In a separate attempt to establish purposeful availment, the Plaintiffs contend that the Court has personal jurisdiction over the Defendants because the Defendants' conduct caused the Plaintiffs harm *in* Virginia. The Plaintiffs invoke this theory of jurisdiction under the so-called "effects" test, which gives the Court personal jurisdiction over a defendant if he or she intentionally directed activity in the forum state that caused harm to the plaintiff. The Plaintiffs cannot satisfy the effects test.

The Supreme Court has long held that the purposeful availment prong of the personal jurisdiction analysis can be met if a defendant's "intentional conduct [in the foreign state was] calculated to cause injury to [the plaintiff] in [the forum state]." *Calder v. Jones*, 465 U.S. 783, 791 (1984) ("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California."). *Calder*, however, does not vest jurisdiction in a state merely because it serves as the locus of the plaintiff's injury. *See Walden*, 134 S. Ct. at 1125 ("[M]ere injury to a forum resident is not a sufficient connection to the forum.").[30] The "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum *in a meaningful way*." *Id.* (emphasis added);

---

[30] In *Walden*, the Supreme Court emphasized that the specific-jurisdiction inquiry focuses "on the relationship among the defendant, the forum, and the litigation." 134 S. Ct. at 1121. There, a DEA agent, who seized $97,000 in cash after a drug dog alerted on it in Atlanta, Georgia, lacked the "minimum contacts" with Nevada necessary to support the exercise of jurisdiction over him. *Id.* at 1126. Thus, even presuming harm from a delayed return of the money, a Nevada court could not order the DEA agent to release the cash even when the owners presented evidence that they were professional gamblers travelling to Las Vegas, Nevada, with a legitimately earned "bank." *Id.* The court held that no part of the DEA agent's conduct occurred in Nevada, that he formed no jurisdictionally relevant contacts there, and that the mere injury to a forum resident was not a sufficient connection to the forum. *Id.* at 1121–26 (citations omitted).

*see also ESAB Group Inc.*, 126 F.3d at 626 ("Although the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld.").

Here, the Second Amended Complaint alleges nothing more than injury in Virginia caused by the Defendants' activities in a foreign state. In a conclusory fashion, the Plaintiffs allege in the Second Amended Complaint that the "purpose of [the consumer] reports was to *target* Virginia consumers for high-interest loans." (Second Am. Compl. ¶ 19 (emphasis added).) The Plaintiffs allege no facts supporting this sweeping allegation and elsewhere state that "Clarity allowed companies like Lead Express to secretly purchase consumer reports *in batches* in order to target vulnerable consumers, *including consumers residing in Virginia*, who may be interested in high-interest internet loans." (*Id.* ¶ 12 (emphases added).) While the Plaintiffs allege that the Defendants pulled Gillison's and Mays-Johnson's consumer reports with the purpose of "target[ing] them for high interest loans," the Plaintiffs allege nowhere that Lead Express's scheme was individualized in nature or aimed in a particular fashion at Virginia.

For this reason, the Court can readily distinguish Plaintiffs' allegations from those cases on which they rely, which, importantly, were decided prior to *Walden*. While each of those cases found personal jurisdiction over an out-of-state defendant who impermissibly pulled the credit report of a consumer, each found that the FCRA violator acted with individualized knowledge of the consumer's residency, and that the so-called "improper pull" was targeted at that resident for a particular purpose. These courts reasoned that no due process concerns existed about the defendants being haled into a foreign state because the FCRA violators knew where the consumers lived and could anticipate the consumers suffering harm in that state. *See, e.g., Myers v. Bennett Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2001) ("[W]e find that Bennett's retrieval

of Plaintiffs' credit report indicates '[t]he presence of *individualized targeting* [which] . . .

separates th[is] cases from others in which we have found the effects test unsatisfied.' As a

result, we conclude that Bennett purposefully availed itself of Nevada by '*intentionally*

*direct[ing]* his activities into [Nevada].'" (emphases added)); *Smith v. Cutler*, 504 F. Supp. 2d

1162, 1167 (D.N.M. 2007) ("Personal jurisdiction can be found to exist in a forum where a non-

resident defendant obtains credit reports without the permission of the resident plaintiff. The

reasoning used by courts is that defendant's conduct in conducting the unauthorized credit

inquiry is *purposefully directed* at the resident in the forum state, and causes injury to that

individual." (emphasis added)); *Cole v. Am. Family Mut. Ins. Co.*, 333 F. Supp. 2d 1038, 1048

(D. Kan. 2004) ("Adler was aware that plaintiff resided in Kansas. Accordingly, Adler's actions

were '*expressly aimed*' at plaintiff, a Kansas resident." (emphasis added)).[31]

The conduct in cases involving the act of pulling one or two reports of a known consumer

does not mirror a company's acquisition of a "batch" of reports on consumers with whom it has

no relationship. While the sheer volume of consumer reports may intuitively seem more

egregious, the Plaintiffs present this conduct in an attempt to establish *specific* personal

jurisdiction on claims asserted by two individual plaintiffs: Gillison and Mays-Johnson. If the

Court were to find specific jurisdiction on the mass acquisition of consumer reports alone, it

would consequently rule that defendants, like Lead Express, purposefully availed themselves of

the privilege of doing business in every state in which the affected consumers reside. If, as the

---

[31] The lone effects-test case that the Plaintiffs cite from this District also does not
persuade. *See Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601 (E.D. Va. 2002). In
*Verizon*, unlike here, the defendants had substantial contacts with the forum. *Id.* at 618–19 ("By
allegedly transmitting millions of e-mails to make money at Verizon's expense, knowing or
reasonably knowing that such conduct would harm Verizon's e-mail servers [in Virginia],
Defendants should have expected to get dragged into court where their actions caused the
greatest injury." (citing *Calder*, 465 U.S. at 789)).

Plaintiffs allege, Lead Express obtained over 1,000,000 consumer reports in this case, such a ruling could result in Lead Express facing suit in all 50 states based on specific personal jurisdiction. Under *Calder*[32] and its progeny, the Court cannot so hold.

Because the Plaintiffs allege no meaningful Virginia contacts by the Defendants that accompanied the Plaintiffs' purported injuries in Virginia, such as actions purposefully directed at Virginia, the Court cannot exercise personal jurisdiction over the Defendants on the basis of the effects test. *See Walden*, 134 S. Ct. at 1125 ("*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant *only insofar as it shows that the defendant has formed a contact with the forum State.*" (emphasis added)). Therefore, this proposed basis for specific jurisdiction also fails.[33] The Court will grant the Defendants' Motion to Dismiss for lack

---

[32] Even *Calder* falls outside the theory the Plaintiffs ask the Court to adopt. In *Calder*, the plaintiff, actress Shirley Jones, brought libel claims in California state court against a reporter and the President and Editor of the National Enquirer in Florida. 465 U.S. 783 (1984). The claims arose from an article written in Florida and published nationally, including roughly 600,000 copies in California, that Jones claimed libeled her and caused harm to her career. As explained in *Walden*, the Supreme Court held that the California state court could properly assert personal jurisdiction over the defendants after "examin[ing] the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story." *Walden*, 134 S. Ct. at 1123. The Supreme Court specifically found the Florida defendants had created "ample" contacts with the forum state of California:

> The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the "brunt" of that injury was suffered by the plaintiff in that State.

*Walden*, 134 S. Ct. at 1123 (citing *Calder*, 465 U.S. at 788–89 ("In sum, California [wa]s the focal point of both the story and the harm suffered.")).

[33] Because the Plaintiffs have not alleged that the Defendants purposefully availed themselves of the privilege of conducting activities in Virginia, the Court need not determine whether the causes of action arose out of those activities or whether the exercise of personal jurisdiction would be constitutionally reasonable. *See ALS Scan, Inc.*, 293 F.3d at 712.

of personal jurisdiction.[34]

### III. Analysis: Motion for Permission to Take Jurisdiction-Related Discovery

Following briefing on the Defendants' Motion to Dismiss, the Plaintiffs, "out of caution," requested jurisdiction-related discovery in order to substantiate their allegations of personal jurisdiction. (Pl.'s Mem. Supp. Mot. Permission Take Jurisdiction-Related Discovery 1, ECF No. 32.) The Plaintiffs seek discovery on the following topics: (1) the data maintained "specifically as to each Plaintiff and generally as to all Virginia residents"; (2) "[w]here, from whom[,] and how such Virginia consumer information was obtained"; (3) "[t]he quantitative volume and profits made by [the] Defendants off Virginia consumer reports"; (4) the "Defendants' knowledge regarding its business activity in Virginia"; (5) "[t]he number of Virginia consumers about whom [the] Defendants have obtained reports and marketed loans" and, (6) "[t]he extent and details of [the] Defendants marketing contacts with Virginia business and/or out of state business customers to whom [the] Defendants have sold reports regarding Virginia consumers." (*Id.* at 1–2.) The Defendants oppose this motion. (ECF No. 36.) Because the discovery requested by the Plaintiffs bears little relevance to the allegations of specific jurisdiction pleaded, the Court will deny the Plaintiffs' request without prejudice.

Although discovery under the Federal Rules of Civil Procedure is generous in scope and freely permitted, district courts "have broad discretion in [their] resolution of discovery problems that arise in cases pending before [them]." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64

---

[34] The Plaintiffs cannot establish personal jurisdiction, so the Court need not consider the Defendants' challenge as to venue. Of course, in the absence of personal jurisdiction, the Plaintiffs cannot establish jurisdiction pursuant to 28 U.S.C. § 1391(b)(3), which states that venue is appropriate in "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." Whether "a substantial part of the events or omissions giving rise to the claim occurred" in Virginia, *id.* § 1391(b)(2), would present a closer call for the Court to make. The Court also declines to address the Defendants' alternative request to transfer the case. The Court's lack of personal jurisdiction over the Defendants moots that issue.

(4th Cir. 1993) (quoting *In re Multi–Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981)).  With respect to jurisdictional discovery in particular, "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery."  *Carefirst of Md., Inc.*, 334 F.3d at 402; *see also Base Metal Trading, Ltd v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 216 n.3 (4th Cir. 2002) (finding the district court did not abuse its discretion in denying jurisdictional discovery where "the plaintiff simply want[ed] to conduct a fishing expedition in the hopes of discovering some basis of jurisdiction"); *Reynolds & Reynolds Holdings, Inc. v. Data Supplies, Inc.*, 301 F. Supp. 2d 545, 554 (E.D. Va. 2004) ("The court does not abuse its discretion to deny jurisdictional discovery when the plaintiff raises only 'bare allegations' to dispute defendant's affidavits denying jurisdictional acts or contacts.").

The Second Amended Complaint alleges no contacts between the Defendants and Virginia beyond the harm to the Plaintiffs themselves.  Even a review of the Plaintiffs' contention that the "Defendants deliberately pulled more than 30,000 consumer reports on Virginia residents to obtain their financial information for the purpose of soliciting them for a loan," (*See* Opp'n Mot. Dismiss 16), "offers only speculation or conclusory assertions" about the Defendants' contacts with Virginia.  Indeed, the Plaintiffs' assertion rests on the attenuated logic that, because the Defendants acquired the Plaintiffs' consumer reports, the Defendants *probably* offered loans to the Plaintiffs.[35]  At best, this assertion is speculative, and discovery to support it would amount to no more than a "fishing expedition in hopes of discovering some basis of jurisdiction."  *Base Metal Trading*, 283 F.3d at 216 n.3.

---

[35] As noted previously, that contention contradicts the Plaintiffs' allegations pertaining to the merits, which assert that the Defendants acquired the consumer reports *not* for the Defendants' use, but to obtain leads for some unknown affiliate company (or companies) to solicit the consumers for loans.

Indeed, some of the discovery the Plaintiffs seek appears aimed at establishing general jurisdiction, which the Plaintiffs rightfully conceded they could not establish. *See Daimler AG*, 134 S. Ct. at 760 (explaining that, to establish general personal jurisdiction, a plaintiff must establish that the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] *essentially at home* in the forum State.'" (quoting *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919)). The Court sees no means of establishing specific jurisdiction from discovery regarding, for example, the Defendants' Virginia profits or the Defendants' marketing in Virginia. Specific jurisdiction requires that the Defendants' contacts with the forum state form the basis of the suit. The Plaintiffs do not tie their sweeping scope of requested jurisdictional discovery to contacts they expect to uncover regarding the causes of action at bar.

Accordingly, the Court is disinclined to afford the Plaintiffs the opportunity to obtain discovery. On the other hand, the Defendants' patently inconsistent declarations give the Court significant pause. The conflicting descriptions, under oath, before the same court raise questions regarding the Defendants' full candor about the business Lead Express conducts. The Court cannot see a rational way to reconcile the two sets of affidavits in this case and the affidavit in *Turnage*. To the extent the Plaintiffs must prove personal jurisdiction, conflicting descriptions of how Lead Express and Naito conduct business hinders the Plaintiffs' ability to fairly state their case. In order to evaluate fully the need for any jurisdictional discovery, the record will be clarified.

In the interest of justice and to establish a full record, the Court will order the parties to re-brief the Plaintiff's request for jurisdictional discovery in view of this Memorandum Opinion. Specifically, the Court orders the Plaintiffs to brief the need for jurisdictional discovery and the relevant scope that could shed light on specific personal jurisdiction in this particular case. In

response, in addition to addressing the need for the Plaintiffs' reformulated requests, the

Defendants shall explain and correct the inconsistences between the declaration filed before

Judge Hudson in the *Turnage* case and those filed in this case (including both the April and July

declarations).  Naito and Chung must personally participate in responding to this query.

After briefing, the Court will address the need for jurisdictional discovery or, if

necessary, further action.  At present, the Court will deny the Motion for Permission to Take

Jurisdiction-Related Discovery without prejudice.

## IV.  Conclusion

For the foregoing reasons, the Court will grant the Motion to Dismiss and deny the

Motion for Permission to Take Jurisdiction-Related Discovery without prejudice.

An appropriate Order shall issue.

M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date:  3/30/17